Our second case is 23-1094 Tillman Infrastructure LLC v. Board of Supervisors. Mr. Lockaby, whenever you're ready, sir. May it please the court, my name is Michael Lockaby. I'm here for the Board of Supervisors of Culpeper County, Virginia and County of Culpeper, Virginia. I'm going to jump straight into this argument. I'm going to apologize to you in a sense because this is going to be far more fact-based, I think, than the previous case was. Because as this court noted in the T-Mobile Northeast LLC v. City of Newport News case, these cases always are very fact-bound. I first want to get rid of a notion that is pointed to throughout, I think, Tillman's brief and that I think to some degree is also a subtext to the decision of the trial court. Which is that the Board of Supervisors is somehow identical to SBA, the owner of the existing tower in this case. The Board of Supervisors' interest is not SBA's interest. The Board of Supervisors' interest is the interest of the public. The Board of Supervisors' interest in this particular case is that this is a case about a 199-foot tall telecommunications tower which was going to be built... Does it matter whether the Board of Supervisors' interest is the same as the SBA? I mean, I think whether we're talking about the shot clock or whether we're talking about substantial evidence, what their interest is doesn't matter. That's why we don't have evidence in the record about whether SBA was giving political contributions to the Board of Supervisors or whether they were funneling contracts to them behind the door. Because none of that matters. Right? So if they were paying them off, it simply doesn't matter to our form of review. Your Honor, I completely agree. That's why we don't have any of that type of evidence here. So the question is just on the merits, right, whether the timeliness or the substantial evidence is an objective inquiry. That's correct, Your Honor. Okay. I just was curious why that's where you started because that doesn't seem to have any relevance to what we're doing. Okay. That was leading directly into my first statement regarding what the background of this tower, less than a quarter mile from an existing tower, along the periphery of the Cedar Mountain Battlefield Study Area under the Culpeper County Comprehensive Plan. I'm sure that Tillman would be very quick to jump up and point out that although that it was not visible from actual state and national historic register sites, it was, however, within the study area that was of particular interest under the comprehensive plan for the county. Along a small one-way road called General Winder Road, of course named in honor of Charles Winder, the only general officer to fall on that battlefield. There were two claims that ultimately the trial court decided this case upon, the first of which was a fairly typical substantial evidence claim under Section 47 U.S.C. 332 C-7, the other of which was under the somewhat more cumbersomely named Section 15.2-2316.4-1C of the Virginia Code. I'll just call that the Shot Clock Claim because it's a lot easier. Thank you for that. Can you start with the Shot Clock Claim? I know that Judge Moon in his order took them in the opposite order, but the Shot Clock Claim seems like the first one because we don't get to the substantial evidence inquiry unless the Shot Clock Claim is resolved. Can you start with that one? Well, I think that the extensive history of application materials trickling into the board of, into the county staff offices is amply covered in the brief. Why does that matter? I thought you submit an application and then the statute says within 10 days. If the board, if the county doesn't send a Notice of Deficiency within 10 days, then it's considered complete. That doesn't have anything to do with whether additional materials are submitted later. It's just Notice of Deficiency within 10 days. Was there any Notice of Deficiency within 10 days? There was not anything called a Notice of Deficiency. There was merely email exchanges about whether everything had made it in or not. But there was no email saying you didn't give us X. It's incomplete. There is none in the record. It's complete on April 22nd. There is an application that is complete. I think that we would, the position that the Board of Supervisors would take is that the application changed to be a different application on July 2nd. There's a zoning ordinance about that, isn't there? It talks about, there's a zoning ordinance, 17-2-6, that if there's a change that's so substantial or significant that a new application is required, the zoning administrator can determine that changes are so substantial they require a new application. Was that determination ever made? I believe that that was an ordinance that was adopted after this, basically in response to this case. I think that the code of ordinances as of the time that this particular application came before the Board of Supervisors did not include that. But wouldn't that address this sort of situation? That would help us know if it's substantial enough that the time restarts. It absolutely would. We're not in a position currently, are we, to judge whether it's so substantial that the time restarted, unless the Board itself or the zoning administrator himself thought it was so substantial that they needed a new application or a new fee or something that would restart the time. I think that you are in the position of making that determination because it's a determination that you can make applying the common sense of an objective legislator under the standard that you have set forth in your cases. So look at the two applications and say, is this the same thing? Help me understand that. We're not called upon to decide whether this zoning ordinance that Judge Rushing talked about is permissible under state law. I think there's like a question about that that we don't have to decide. But under what authority, before that zoning ordinance issued, would there be to have someone say that a change is so substantial? What authority would you be relying on? I don't even understand the argument, frankly. What are you saying gives you the authority to say this is such a substantial change that we require a new application? Where would you get that authority? Under Virginia state law, there is a general common law rule, which I believe is referenced both in the Virginia Supreme Court case of Board of Supervisors of Fairfax County v. Piles from 1983, as well as in the circuit court case of Little Piney Run LLC v. Board of Supervisors of Loudoun County, that deals with when you need to re-advertise and or re-refer an application to the Planning Commission in order to hold a new Planning Commission public hearing as well as a new, potentially a new Planning Commission public hearing, as well as a new public hearing before the Board of Supervisors. And you need to, under some circumstances, to completely reconsider that. And that is, of course, what the Board of Supervisors did. They held another public hearing on October 5th. And so your position is there's a common law rule in a different context that governs over the statutory structure we've got here? I believe that that rule would apply even given the statutory structure that you have. That you have the authority to say what? You have the authority to say that an application has changed sufficiently, that it needs to be re-advertised, and a new public hearing needs to be held. And you do that based on the common law rule despite the statute to the contrary? I don't believe that there is a statute to the contrary, Your Honor. The statute, the statutory law, well, the law of Virginia is that if you haven't held an hearing, the application that you adopt is by definition void. So, all right. So, under that rule, under your understanding, if you don't have a hearing, you can't adopt it. So, if you just don't have a hearing until day 180, what happens? And in your view of the law, with the common law rule and the statutory rule, you have no hearing until day 180. Day 180, you hold a hearing. What is the status of the application at that moment? Well, it depends on at what time the application was changed, such as you needed to have that additional public hearing. No, no. I'm just saying you just decide to slow off the thing, right? And so, you decide not to hold the hearing until day 180. Assume the start date, whatever the start date is. You can pick your start date. But 180 days later is the first time you hold any hearing. Then you have a problem under this statute. No, you don't have a problem. What happens? What's the status of the application on day 180 when you hold that hearing? The status of the application is... It's granted, right? It's deemed granted. It's granted. But I don't think... And it doesn't matter that you didn't hold a hearing, right? The hearing requirements don't trump the shot clock. Correct. Right? So, that's why I'm having trouble understanding your common law argument about when you have to have a new hearing. If you don't have a hearing, the application is granted on day 150. That's correct. However, I think that you're missing the facts of this case, your honor. In the facts of this case, we don't know what the application was that was actually deemed approved. Was it the application as it stood on the day that it was deemed submitted? Is it the application as it stood at the end of the shot clock? Is it the application as it stood at the time that the Planning Commission made the last official act relating to this that was before the shot clock? Well, that argument, I mean, that argument sweeps in everything. Then you don't even need your substantial change rule. If the party submits any new piece of evidence at all, or there's the slightest suggestion that they might make an edit to how they're going to construct the tower, you would say, well, we have no idea what was under the rule. It seems pretty clear that the Virginia legislature has said, at 150 days, it's approved. So, whatever is in place at 150 days is approved. And where is there room for your argument about, you know, changes or any additional information upsetting this, what the statute requires? The statute has one exception, and that's for mutual agreement. The problem in the practical context of this particular thing is that it is not in the least bit clear that the Board of Supervisors, even having had its public hearing long prior to the 150-day rule, could have actually acted without having another advertisement and moving forward again at another date because of the change to the application. Maybe they should have thought about that. That's not really our problem. Virginia has a statute that says it's deemed approved. If the board thought that they needed to have another hearing or they needed more time, they could have denied it and required a new application. They could have reached a mutual agreement with the party. So, it still leaves, ultimately, the county in the position of, you're going to have to fashion a rule and tell us what that rule is with regards to what application it was that was approved. The application. There's only one application. It's the application. That's what the statute tells us. It's the application. It doesn't mean that it can't change. I can have the opinion. My clerks and I, we work on an opinion. The opinion. It changes all the time. When is it the opinion? Whenever it's deemed filed. So, yes, there have been changes, but the opinion hasn't changed. It's still the opinion. The application is one application. Yes, it has been modified in minor ways from a lattice to a pole and all these other things, but it's still the application. So, it's deemed approved as of the time, that is, the 150 days after it ran. So, you would make that rule in your opinion, which would at least give us... No, we would just follow the statute is what we do. We're just telling you what the words of the statute seem obvious to me. Well, the words of the statute appear obvious to me that the application is what was in existence on April 12th, which is a lattice tower. Can I ask a slightly different question? You say repeatedly in your brief, the county did not receive the required structural analysis from Tillman until May 12th, 2021. You say that several different times in your brief. It seems to me that statement is false. And so, I just want to understand what your position is. You're absolutely correct. There was one that was submitted before April 12th that was revised subsequently based upon comments. And I can only apologize... No, no, no. This is not a critique. I mean, there's a lot going on here. I just want to make sure I'm not missing the argument because it seemed like I saw the one from April. And so, I wanted to make sure I understood it. Yes, sir. That May date was when the final payment for the application came in, but I certainly don't want to state based upon my memory of a 2400 page record. But that's the vast majority of the rest of the information was in. Can you talk a little bit about your concern regarding the procedural vehicle by which the district court granted relief to the party on the other side? You seem to be really concerned about that particular issue. And I'm not sure that I understood why it mattered in this case. Well, it mattered because... You guys may be getting ready to go, your honors. However, within the context of this, we were unsure coming into this argument about whether the application that was ultimately approved was for a lattice tower or monopole, whether there was screening required along General Winder Road, unclear whether FirstNet was required. None of these things were, at least to us, at all clear. There's going to have to be a site plan, a stormwater plan, and a building permit come in for. Those are all administrative approvals, but the administrative officer doesn't necessarily know what permit they should issue. And consequently, if Tillman doesn't comply with the permit, what they can issue a notice of violation for. And so the hope was that by giving the Board of Supervisors a final opportunity to adopt a conditional use permit, which does not prohibit whatever it is, we can at least have something on the books, which is a conditional use permit, which we can then process through the normal processes a site plan for. But how, just, sorry. No, go ahead. How could they do that? Because the statute has said the application is deemed approved. Like the Board no longer has the authority to approve or deny or modify. Like they're, like the statute, I'm not saying the statute is a great idea, right? I'm just saying the statute says it's deemed approved. And once it's approved, like the Board just doesn't have anything to do anymore. Like they're out of it. They have no authority. They have no authority over the conditional use permit. But let's be clear that there are additional processes that need to happen. Totally fair, right? But that may or may not be true. I actually have no idea, right? But the application has been approved, right? And we can't change that fact, nor can the Board change that fact. The application is deemed approved. And so there's no reason for the Board to pretend to consider the application. Because it is approved, right? And there might be something else that has to happen. And, you know, but that's a separate question from whether the application is approved. It is, but it still leaves us guessing, unfortunately. And it presents us. How would it be any different from the Board approving the application? Have they acted? I mean, there's still going to be, I suppose, negotiations and things that need to be done after the approval. But in that sense, how is this any different? Well, after the approval, there's that. And I apologize, Your Honor. I have now gone far over my time. You can keep talking as long as we're talking. So go ahead. Understood. Thank you. Once you move, those other approvals are not negotiations. They are in the nature of checklists. The problem is that there are holes in that checklist. If you don't have something that lays out what the design is and what the conditions are on that. And again, I see which way this quarter is going. You believe that the structure that was permitted was the structure that would exist as it had been submitted as of day 150. Fair enough. What about those other conditions regarding screening, regarding having FirstNet on this, which is the only thing that makes it permissible? Was the screening? So just help me understand from a factual matter. The screening, was that not part of the application on day 150? As it happened on day 150, the Tillman was asking for the Board of Supervisors to waive that requirement. And county staff was recommending against waiving that requirement. That was an unresolved issue. So the application did not include it at that point in time. Correct. Yeah. All right. Thank you very much, Mr. Blanken. All right. Thank you, Your Honor. Ms. Fogarty. Good morning, Your Honors. May it please the Court. My name is Bethany Fogarty and I represent the Appellee Tillman Infrastructure. The fundamental issues before this Court are whether the conclusory assertions of a monopolist constitute substantial evidence justifying the denial of Tillman's use permit application, and whether a locality can flout the statutory command of the General Assembly to act on an application within 150 days, simply by requesting additional information and changes to the design of the tower. The answer to both of these questions is no, which is why Tillman brought this suit to vindicate its rights under the Telecommunications Act of 1996 and under the state shot clock statute. This Court should affirm the district court's ruling on the substantial evidence claim for two reasons. Can you start with the shot clock? Absolutely. You might guess from the earlier argument that at least some of us are more interested in that question than the substantial evidence one. Yes, Your Honor. And there are three reasons that this Court should affirm the ruling of the district court on the shot clock claim. First, as Judge Rushing alluded to, a straightforward application of the state statute confirms that the district court was correct in concluding that Tillman submitted its application by April 8th and that it was deemed complete 10 business days later. Second, there's no basis in law or fact. Can you stop for that one just one second? I mean, I understand that this doesn't really matter because the 8th and the 22nd doesn't actually change the answer, but I read the statute as saying that if you don't provide it within 10 days, it was deemed to have been complete as the retrospectively, it was deemed to have been complete when submitted on April 8th, not actually 10 business days later. Do you have a view on which of those is the correct reading of the statute? Like does the deemed complete mean deemed complete as of 10 business days after submission or where there's no objection or no deficiency notice provided, it's deemed complete as of the day it was submitted so that it would be April the 8th. Do you have a view on which of those is the right date? Your Honor, in my view, April 8th is the correct date because the statute talks about when a locality receives the application, the shot clock begins to run. Now the district court looked at the latest possible date in calculating it just to make sure that whichever way this court turned on that, that it would be past the shot clock. But based on the statutory language, that it's when the locality receives the application is when the clock begins to run. This court should use April 8th as the appropriate date. And we know the county received the application on that day because their zoning administrator acknowledged receipt of the application. And he acknowledged that the onus was on him to identify any deficiencies, stating, I'll be in touch if I see anything missing. And as the county concedes, there is nothing in the record constituting a written identification of deficiencies in the next 10 business days. So is that the application that was approved? And so it was a lattice tower that was approved, not a monopole? No, Your Honor, because during these application processes, there is a bit of a give and take. And that's kind of reflected in the Planning Commission dialogue where they're talking about what conditions the applicant would agree to. And we agreed to change the design of the tower in response to a request by Supervisor Frazier to change it to a monopole. And that would alleviate the board's concerns and the concerns raised by Piedmont Environmental Council of the fact that a lattice tower is recognized as having a greater aesthetic effect than a monopole tower. But the fact that we changed the application and agreed to this change requested by the board in no way restarts the shot clock, because the state statute does not provide for restarting the shot clock. And nothing in the county's zoning ordinance would have allowed them to have restarted the clock either. Can I ask, can you respond to your colleagues' concerns about these number of unanswered questions as to what happens if we deem the application approved? That kind of leaves the Board of Supervisors in a bit of a bind as to how they move forward. What's your response to that? Well, Your Honor, I think it goes back to the point raised by Judge Rushing, which is the application that was pending at the time that the shot clock expired is the application which was deemed approved. No, I understand that. I guess I'm talking about the practical realities on the ground, like what happens if we were to agree with you? I mean, are there some things that still need to be done? Obviously, if the application has been approved, then what happens? Well, Your Honor, there are certain approvals, like construction permits, that still need to be issued. And I think that as a practical matter, the people in the zoning staff who are issuing those building permits would look at what the application was pending at the time the shot clock expired and use that as the guidance for what tower design are we approving a construction permit for? Wasn't that the lattice? No, we had submitted revised drawings indicating that we were going to build a monopole design, and that was the design that was in effect as of the time the shot clock expired. So that's what they would be issuing the construction permits for and the other permits that are required to get a tower up. And because they can simply look to what was the state of the application at the time the shot clock expired, these practical concerns can be easily resolved using a common sense interpretation of the application as it existed at that point in time. Now, back to their contention that they're... Just so that I'm... So the screening question, right, was one of the questions that he raised. There was an ongoing dispute about the screen. Your position is the application as of day 150, depending on whether we use the 8th or the 22nd, I don't think it matters. But on day 150, the application did not include a screen, and therefore the application that was approved does not include the screen. That's correct, Your Honor. And I'll note that the Planning Commission could have recommended as a condition to approval that screening be a condition, but it did not. So because there... Or you could have agreed when they raised it, you could have said, sure, we'll add the screening and submitted new drawings, just like you did with the monopole system. Had you done so, it would have been part of the application as of day 150. That's correct, Your Honor. But the board ultimately did not ask us to do that because they deferred the application and did not set it to be brought up for hearing before the shot clock expired. Now, to this notion that the shot clock should have restarted, there are a number of issues with this. First is the fact that there's nothing in the statutory text that would have allowed for the shot clock to restart. And the second issue with this is that it would have been... Do you agree the parties could have agreed to it? So in other words, the Planning Commission could have, or the board, excuse me, could have come to your client and said, listen, we got 150 days here, but we need another 30 days. Could you all have mutually agreed to it? Absolutely, Your Honor. Both the state and the federal shot clock allow for locality to ask for additional time if it's needed. But here, the fact of the matter was that nobody asked Tillman for additional time because they didn't need additional time to consider this change. This was a change that was specifically requested by the Board of Supervisors. It was a change that when their Director of Planning and Zoning, who was also their expert witness below, heard about it, he said, quote, it doesn't really impact our review. It was a change requested by interested groups, and it's a change which everybody acknowledges decreases the visual impact of the tower. In fact, it's such a routine change that sometimes a board will, as a condition of approval, require a change from a lattice to a monopole design, as was the case in a case before this court, USCOC number three versus Montgomery County Board of Supervisors. So this isn't a substantial change in any sense of the word. And even if it were, there's no basis in the statute to consider that. And that brings us to the question of the remedy. And before you go there, your colleague on the other side said that even though maybe the statute doesn't expressly provide for that flexibility with respect to the Board of Supervisors, that there's a common law avenue or route toward flexibility. And he cited a couple of Supreme Court of Virginia cases. Do you want to address those? Certainly, Your Honor. And part of the issue with that argument is the fact that the statute actually says that it must be deemed approved or the action must occur within 150 days or the lesser of the time allowed under the federal shot clock. So regardless of what Virginia would say, if the federal shot clock would not toll, then they still need to act on that application. And the federal shot clock provides for 150 day time frame and doesn't consider the common law of a specific state allowing it to essentially restart the shot clock. It would consider additional application materials being submitted or changes to the design to simply continue allowing the shot clock to run. And therefore, whatever Virginia law might have, common law might have said, and I'll admit that I'm not familiar with the cases that Mr. Wacoby has cited, because the federal shot clock still would have expired, they still had an obligation to act under the state statute. And that state statute would displace common law to the extent that it was contradictory to it. Now, onto the issue of the remedy. The premise behind the board's argument is that they still have the authority to act on the application. But the Supreme Court of Virginia disagrees. The only time the Supreme Court of Virginia has expressed an opinion about this specific statute is in Berry v. Board of Supervisors of Fairfax County, in which the court identified this specific statute as one of the specific zoning and land use matters where a locality must act within the statutorily defined deadline or it loses the ability to act at all. And the reason for this is because Virginia follows Dillon's rule. And under Dillon's rule, the locality can only take actions that it is empowered by the General Assembly to take. And the General Assembly, by passing this statute and imposing the deemed approved remedy, has limited the power of the locality to act on the application. And if they don't do so within 150 days, they don't have the power to deny it. And therefore, the district court was correct. Do you think they have the power to grant it? So in other words, if, I mean, what happens if the court, as they did here, issues a declaratory judgment? Does the board have to like put a stamp on it? Or is that, is it just finished as it is? It is just finished as it is. Based on the language used by the Supreme Court, they don't have the ability to approve or act upon it. Now, as a practical matter, if they'd approved it on October 5th, we wouldn't be here. But based on the Supreme Court statement, that seems to be an express indication that Dillon's rule precludes them from taking any sort of action on this. And the declaratory judgment was the appropriate. So your point is that had they approved it on October the 5th, they didn't have the authority to do that. But if they had done it, it in fact would have been harmless. Because they would have been effectively ratifying what the statute already had said occurred. That's correct, Your Honor. And therefore, the declaratory judgment was the appropriate remedy to be issued by the district court. Now, I want to turn briefly to the substantial evidence claim. And the district court's ruling on the substantial evidence claim  First, the district court properly determined that the evidence relied upon by the board was conclusory and speculative and failed to rise to the level of substantial evidence, particularly in light of the evidence put forth by AT&T and Tillman that fairly detracts from the weight of that evidence. And second, the district court was correct in considering fees, costs, and contractual provisions imposed by SBA on AT&T to co-locate on the SBA tower as this analysis is required by law. Now, the substantial evidence rationale that the county has appealed is that of co-location. And under the county zoning ordinance, they can deny an application if there's another available tower to host the wireless facilities that would go on the tower that is being proposed. But a tower is unavailable if the fees, costs, or contractual provisions for sharing in that tower are unreasonable. And this is important because it's not just an issue of rent as the county would have this court believe. That was one of two contractual provisions identified by the district court. The other contractual provision is the fact that every time AT&T wants to swap out its own equipment on the SBA tower, it has to go through a lengthy administrative review process. It's charged an application fee and it has to execute a lease amendment which increases its rent. And the undisputed testimony from Garrett McGuire of AT&T was that the market right now dictates that tower modifications don't cost any extra money. And Tillman doesn't charge these extra fees. Other tower companies don't charge these extra fees, but SBA does. And there is no evidence in the record that would contradict that. But even on the one issue that they do appeal, that of rent. There's no substantial evidence indicating that SBA's rents were reasonable. Who's got the burden on that? Well, Your Honor, this court has always said that the court must look at whether the denial of the application is supported by substantial evidence. Isn't it your burden? No, Your Honor, because this court said in T-Mobile versus City Council of City of Newport News that the substantial evidence standard doesn't look at whether the application itself is supported by substantial evidence. Instead, it looks at whether there's substantial evidence for the denial. Now, the court... Don't you agree that the ordinances allow the county to deny the permit unless they can deny it because of co-location, unless the applicant proves that the costs and fees and contractual provisions were unreasonable. So it was Tillman's burden to prove to the county that these were unreasonable fees. And if they didn't, the denial is supported. Well, Your Honor, that's how the county's ordinance is worded. But that's very similar to the ordinance that Newport News had in T-Mobile versus City of Newport News. There, the ordinance said that the applicant had the burden to show that the proposed tower would not have an adverse impact on property values. And yet the court looked at what evidence was there on the record to indicate that this tower would have an adverse impact on property values, not at what evidence T-Mobile had put into the record. Do you agree if there were no evidence? If Tillman had submitted its application and there were no evidence in front of the board about unreasonable fees, the board could have denied it and that would have been supported. That would have been a denial supported by substantial evidence because there was no evidence proving that the fees were unreasonable. I would agree that Tillman at least had the burden of production to indicate that there was some reason to believe that the fees on the existing tower were unreasonable. But in reviewing, this court must look at whether there is evidence of reasonableness, as this court made clear in T-Mobile versus City Council of City of Newport News. Right, we're not reviewing the application de novo. We're not a county planning commission. And we don't know anything about cellular towers and whether they look nice in one spot or another. We're reviewing whether the board had substantial evidence. That's a lower bar for whether what the board did is supported by evidence. Right, and the evidence before the board was clear that these rates were unreasonable. They're relying primarily on conclusory assertions by SBA's lawyer. Wasn't there evidence on both? There's one party was comparing a long-term contract to an ad hoc contract. The other side is comparing a different long-term contract to a different ad hoc. Didn't they have, didn't the board have in front of it evidence on both sides that it could weigh? They did not have substantial evidence to justify the denial. This court and other circuit courts have said that certain types of evidence simply doesn't rise to the threshold of substantial evidence. And that includes speculation, conjecture, uncorroborated assertions, and conclusory testimony, regardless of whether given by an expert or a lay witness. And here they rely primarily on the conclusory assertions of SBA's lawyer that its rates were not prohibitive and that they were quote in line with the market, a market that they didn't define, but that they suggested was being defined rather narrowly, such that they be skewed by its own monopolistic brands. Now the evidence from AT&T and Tillman in the form of a sworn affidavit was that this tower, the rents charged by SBA are more than double that which Tillman would charge. The rate of rent escalate escalations under the SBA agreement are greater than those called for by Tillman. Do we need to decide this question? Your Honor, this court does not need to decide this question if it finds in our favor on the shot clock claim. Because as I think Judge Richardson pointed out, if the court rules in our favor on the shot clock claim, then it doesn't matter whether there was substantial evidence to support the denial or not. But to the extent that the court is inclined to address the substantial evidence claim, I would point out that the rate of rent escalations was greater. The fact that they have these additional lease modification terms is different than the market. I would also note that this was identified as being one of the most expensive towers in the country. And the fact that there are different types of leases, I would point the court to the fact that AT&T has managed to enter into an MLA with all of the other tower providers. And the fact that they haven't been able to reach an agreement with SBA is in itself evidence that SBA is not coming to terms in line with the market and that their terms are unreasonable. And unless the court has any other questions, for the reasons stated here today and those articulated in our brief, I ask the court to affirm the decision of the district court. Thank you. Thank you, counsel. Thank you, Your Honor. I just want to address a couple of points very carefully. The first is that the modification from a lattice tower to a monopole was not instanced by any official action of the county. It was instanced by a suggestion, a sidebar suggestion by one Board of Supervisors member. And we, my opposing counsel has... After that, I just want to make sure I understand the facts. After that comment is made, they then submit new drawings and new documentation that reflect the monopole instead of the lattice. Correct. I merely wanted to make the point that what gains you one vote might also lose you two. If you get to vote, that's the real question, right? If you don't get to vote, it might gain you nothing. Absolutely. But merely to make the point that to the extent that it might be construed to have been an official act of the county respecting that it was an official, it was not an official act of anybody at all. I wanted to note that the federal shot clock issue was expressly not pledged. In your view, was anything an official action of the county? Other than setting the hearings, did they take other official actions? Right? Because I mean, you know, there's these emails going back and forth, but I take it you would say those are not official actions either, right? Because they don't have a vote. So from your perspective, the only official action that the board took was to set the hearings. And then ultimately, the October 5th action. But there's the hearing in the summer that they sat. So there is, there were actually two findings by the planning commission, one of which was that this was in substantial accord with the comprehensive plan. The other of which was an action to recommend to the board supervisors for its final action, the conditional use permit. Those are two separate acts. The action on the comprehensive plan conformance was potentially final if the board of supervisors did not make a decision. The recommendation on the conditional use permit was not final until the board of supervisors acted upon it, or as you say, it was deemed approved so that such that that ended. But the substantial conformance determination by the planning commission was potentially a final act at that time. Okay. I want to move very quickly also to just very to point out that really, really, when you look at the record, and I believe, Judge Rushing, that you kind of pointed this out, what the board of supervisors was faced with regarding the substantial evidence about the about what the rates were for these leases was two flip sides of the same coin. You had an affidavit and the testimony from McGuire, which were, of course, representatives of AT&T slash SBA. I don't know that it was ever 100% clarified. And the other of which was from the attorney from SBA. Tillman makes the argument that AT&T had managed to reach national master agreements with every other major tower provider other than SBA. Simultaneously, SBA pointed out that they had reached master lease agreements with every other major carrier except AT&T. They were both making arguments about mixing ad hoc one-off leases with master leases that cover hundreds of sites. I know that my opposing counsel testified to some degree about what she thought the market for those looks like. I represent several tower owners. We actually do what SBA does. So I don't know what the market is. There certainly wasn't sufficient evidence to talk about what the market was in this particular case. And with that, your honors, I wanted to simply to point out those couple of small issues. I think that otherwise, the briefs and the arguments you've heard today sufficiently address what we have to say, but I'm more than happy to answer any further questions that you can have. Thank you, Mr. Lockwood. Thank you. We rest. Thank you. I appreciate the arguments by both counsel in this case. The matter was ably presented. We're going to come down and greet you and then move on to our third and final case.
judges: Albert Diaz, Julius N. Richardson, Allison J. Rushing